UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DENIS JOINER | No. 25 CR 436<br><br>Judge Jeremy C. Daniel |

# GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum. Defendant Denis Joiner is before this Court after having been convicted of possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

Defendant distributed synthetic cannabinoids throughout the United States, primarily through the mails, including into correctional institutions, jails, and prisons. This type of drug smuggling, specifically in prisons and jails, has shown to present significant risks to inmates, including potentially causing seizures, strokes, heart attacks and death. Moreover, prison personnel have been unable to stem the flow of such drugs into their institution. One report regarding a prison in Ohio described that the facility was overrun with synthetic cannabinoids, and likened the prison to the "Walking Dead," with prisoners "passing out or shuffling around, grunting with burn holes in their clothes," and dying of overdoses. Laura A. Bischoff and Doug Livinsgton, *'Like the Walking Dead': Smuggled Drugs Fuel Chaos Inside Ohio Prisons*, THE MARSHALL PROJECT, March 29, 2026, available at

https://www.themarshallproject.org/2026/03/29/ohio-prisons-drugs-k2-overdose-deaths-prison-conditions (last visited June 24, 2026). Due to the seriousness of defendant's conduct, and for the reasons below, the government recommends that the Court impose a sentence of 84 months, in the middle of the advisory sentencing guidelines range.

## BACKGROUND AND OFFENSE CONDUCT[1]

Over the course of 2024 and 2025, defendant Denis Joiner ("Joiner") possessed and distributed synthetic cannabinoids, including MDMB-4en PINACA and ADB-4en PINACA, primarily through the mails. PSR ¶ 8. During that time, Joiner utilized a residence in Calumet City, Illinois to store bulk quantities of synthetic cannabinoids. Joiner also used that facility to process synthetic cannabinoids into liquid form, which he used to soak items made of paper, such as sheets of paper and books. Joiner mailed multiple packages containing these paper items to his customers, including to individuals located in federal and state correctional institutions, jails and prisons. *Id*.

*Background on Synthetic Cannabinoids*

[1] The information in this section is derived from the evidence presented at trial, the PSR and other materials provided to the Probation Department in connection with the preparation of the PSR. At sentencing, a district court may rely upon information contained in a PSR as long as the information is well supported and appears reliable. *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004).

Synthetic cannabinoids are a class of controlled substance that are chemically similar to chemicals found in marijuana, but, unlike marijuana, which is naturally occurring, are manufactured commonly in a laboratory or abroad. Synthetic cannabinoids are usually significantly more potent than marijuana, and pose a risk of overdose, including potentially causing seizures, stroke, heart attacks and death. PSR ¶ 9. These substances are often smuggled into jails and other institutions through paper soaked with synthetic cannabinoids, which are often disguised as inmate mail, reading material, or legal materials. After arrival at the facility, inmates who receive this paper commonly cut the sheets into smaller squares, which are distributed to other inmates at the jail. Despite measures taken by jail personnel, including mail screening, and narcotics-trained canines, law enforcement has been unable to stop liquid-soaked paper from entering the jail population, which has led to multiple overdoses, including overdoses resulting in death or hospitalization. *See* Blair Paddock, *Paper Mail is Seen as a Source for Drugs in Illinois Prisons. How is it Tracked?*, WTTW, Feb. 3, 2025, available at https://news.wttw.com/2025/02/03/paper-mail-seen-source-drugs-illinois-prisons-how-it-tracked (last visited June 24, 2026).

Recently, as a result of the issues presented by drug-soaked prisoner mail, the Illinois Department of Corrections ("IDOC") has implemented a policy allowing IDOC personnel to electronically scan and digitize incoming mail. *See* Jeremy Gorner, *Illinois prison officials allowed to scan incoming mail amid reports they are tainted*

*by chemicals and drugs*, CHICAGO TRIBUNE, September 3, 2025, available at https://www.chicagotribune.com/2025/09/03/illinois-corrections-prison-mail-scanning/ (last visited, June 24, 2026).

*Purchases or Seizures from Defendant*

During the course of the investigation, law enforcement utilized confidential sources to conduct controlled purchases of synthetic cannabinoids from Joiner. In some instances, defendant sent an associate, Individual-1, to complete the transaction. In total, law enforcement conducted six controlled purchases involving approximately 92.9 grams of MDMB-4en PINACA. PSR ¶ 10. Defendant or Individual-1 received approximately $6,600 over the course of the controlled purchases, $3,000 of which was provided to defendant.

Additionally, law enforcement also seized multiple packages sent by defendant through the mails, which contained synthetic cannabinoids. For instance, on May 12, 2025, Joiner traveled to the Lansing Post Office in Lansing, Illinois, and mailed a flat-rate envelope to an individual in Jefferson, North Carolina. The return address was "Flickshop Photos, PO Box 1818, Lansing, Illinois," which was a post office box controlled by defendant. After the package was delivered into the mails, law enforcement seized it and executed a federal search warrant on the package. Inside, agents seized a cloth saturated in liquid wrapped in clear plastic vacuum sealed bags. The DEA laboratory determined that the cloth contained 61.4 grams of a mixture of ADB-4en PINACA, ADB-INACA (not controlled), and MDMB-INACA (not

controlled). PSR ¶ 11.

Similarly, on June 2, 2025, defendant again traveled to the Lansing Post Office and mailed a brown parcel. The return address was again Flickshop Photos, PO Box 1818, Lansing Illinois, and the package was addressed to "Levon Moore," which was one of defendant's aliases. Law enforcement seized the package and searched it pursuant to a federal search warrant. Inside was a tan powder, which was 1,003 grams of MDMB-4en PINACA. *Id.* Law enforcement also seized additional packages that contained a total of 50.9 grams of MDMB-4en PINACA. *Id.*

On July 29, 2025, agents executed a search warrant at one of defendant's residences in Calumet City, Illinois. Inside the residence, agents seized what appeared to be a laboratory, with multiple Pyrex trays, bottles, an aquarium, funnels, mixing bowls, latex gloves, and other items. Agents also seized 1,544.157 grams of MDMB 4-en PINACA, including the substance in powder form. Moreover, agents seized multiple shipping-related items, including mailing labels (including some with names of correctional institutions in the United States), flat-rate boxes, tape, and paper products similar to items seized in this investigation, such as books and paper. Based on the items seized, agents believed that defendant utilized the residence to convert powder MDMB 4-en PINACA and other synthetic cannabinoids into liquid form, soak paper items in the liquid, and prepare those paper items for mailing. PSR ¶ 12.

In total during this investigation, law enforcement either purchased or seized

2,752.357 grams of controlled synthetic cannabinoids attributed to defendant. PSR ¶ 13.

## GUIDELINES CALCULATIONS

The government concurs with the Guidelines calculations of the U.S. Probation Office ("USPO"). Specifically, the government agrees that the base offense level is 26, based on a drug quantity of at least 2,752.357 grams of synthetic cannabinoids, pursuant to U.S.S.G. §§ 2D1.1. Two levels are added because defendant distributed the controlled substances to individuals in correctional centers, pursuant to U.S.S.G. § 2D1.1(b)(4). Moreover, two levels are added because defendant maintained a residence for the purpose of manufacturing or distributing a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(12). After a three-level reduction for acceptance of responsibility, the offense level is 27. The government agrees that defendant has a criminal history category of II, and therefore, his advisory guidelines range is 78 to 97 months' imprisonment.

## SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7).[2] One of those factors is the advisory range set by the Sentencing

[2] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the

Guidelines, and another is the Sentencing Commission's policy statements. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reflect that a bottom-of-the-guidelines sentence of 10 months of imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

## I. <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are serious and warrant a significant sentence of imprisonment. Drug trafficking is a serious offense, and the drugs sold here are dangerous. The quantities seized or purchased in this case are also significant. Indeed, the drug quantity is over two kilograms of synthetic cannabinoids, although that quantity is likely an undercount based on the significant quantities of drugs that defendant likely sold that have not been quantified. Defendant's offense was also sophisticated, involving converting powder synthetic cannabinoids into liquid form, soaking paper products used as a substrate for drugs, and then mailing them to destinations throughout the country. Defendant maintained a laboratory to process these drugs at one of his residences in Calumet City.

---

defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Even more concerning, defendant distributed cannabinoids into prisons and jails, creating a risk that inmates would be subjected to overdoses and potentially death. Although the government is not able to tie any specific overdoses in prisons to substances distributed by defendant, U.S. Probation is surely correct that, "due to the potency of the drugs, there is a good possibility that some" prisoners suffered overdoses as a result of defendant's conduct. Even absent overdoses, defendant's distribution of drugs makes the dangerous environment of prisons even more so. Indeed, as described above, prison personnel have attempted to stem the tide of these substances flowing into institutions, with little success. Further, some prisons, including MCC-Chicago, have implemented policies and procedures to attempt to stop drug-laced paper items from coming into the facility, including by restricting inmates' access to such items. Indeed, MCC-Chicago now restricts even prisoner access to paper discovery, which has presented logistical difficulties for cases in this District.

## II. History and Characteristics of Defendant

Defendant is a resident of Lansing, Illinois. Moreover, in 2013, defendant was convicted of stealing firearms from a licensed dealer in the Southern District of Illinois and was sentenced to 108 months imprisonment. Notably, defendant's sentence was significant below the advisory guidelines range. In that case, defendant and his co-conspirators burglarized six licensed firearms dealers and stole over 450 firearms. The defendant and his co-conspirator returned to Chicago to sell the firearms. Additionally, after defendant was observed by law enforcement shooting

guns in the air, defendant ran from the Chicago Police Department. PSR ¶ 37. While imprisoned on that matter, defendant incurred two disciplinary citations, including for failing to follow safety regulations and phone abuse. *Id.* Defendant apparently was successful on supervised release, which was terminated early on May 11, 2022. However, within approximately two years, defendant returned to committing the instant offense.

The government understands that defendant's lack of violations while on bond, and his attempts to work while released, as well as other factors raised in defendant's sentencing memorandum are mitigating. Therefore, the government is not recommending a sentence at the top of the advisory guidelines range. However, defendant's prior federal conviction is serious, and therefore, defendant's history and characteristics warrant a significant within-guidelines sentence.

## III. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and To Provide Deterrence**

The sentence that this Court imposes should also reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide deterrence. Here, the defendant's conduct is serious, as described above. Defendant's sentence should reflect the seriousness of the offense. Further, defendant's prior federal sentence, including a period of supervised release, did not deter defendant from committing further crimes (perhaps because defendant received a significantly below-guidelines sentence in that case). Consequently, a within-guidelines sentence

should be imposed to specifically deter defendant from further criminal conduct and to protect the public from such further crimes.

Additionally, as described above, defendant's conduct fits into a larger trend of drug traffickers smuggling drugs into prisons, jails and other correctional institutions, presenting a recent acute issue for prison staff and inmates. A significant sentence of imprisonment will send a message to the community at large that such conduct will not be tolerated and will send a deterrent message that those who engage in such conduct will receive significant periods of imprisonment.

## IV. Supervised Release

The government agrees with the Probation Office's recommendation to impose a term of supervised release in order to provide additional specific deterrence to the defendant and to assist with his rehabilitation following his custodial term of imprisonment. Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the government concurs with Probation's recommendation that the term of supervised release be three years, which is the minimum term of supervised release. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in the defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth in the PSR.

## CONCLUSION

For the reasons stated here, the government respectfully requests that this Court impose a sentence of 84 months' imprisonment followed by three years of supervised release.

Dated: August 18, 2026

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Jonathan L. Shih*
JONATHAN L. SHIH
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5361
jonathan.shih@usdoj.gov